THE WOODLANDS LAND DEVELOPMENT COMPANY, L.P., Appellant,

v.

Jim and Laura JENKINS, Appellees.

No. 09–00–037–CV.

Court of Appeals of Texas, Beaumont.

Submitted Feb. 15, 2001.

Decided May 24, 2001.

David E. Bernsen, Elizabeth M. Marsh, Germer, Bernsen & Getz, Beaman & Brown, LLP, Austin, for appellant.

Eric Yollick, Yollick Law Firm, PLLC, The Woodlands, for appellee.

Before WALKER, C.J., BURGESS and GAULTNEY, JJ.

## OPINION

BURGESS, Justice.

The Woodlands Land Development Company, L.P. ("Woodlands") appeals a judgment in favor of Jim and Laura Jenkins ("Jenkins" or "Appellees") for $103,000 in compensatory damages, $35,000 in attorney's fees, and $1,282,500 in exemplary damages. Appellees sued Woodlands, Westbrook Building Company, Inc. ("Westbrook"), and other defendants [1] for property damage and mental anguish in connection with their purchase of a new home. Among Appellees' theories of recovery were statutory fraud, common law fraud, breach of earnest money contract, breach of covenant, and violation of the Texas Deceptive Trade Practices Act (DTPA). The jury found in favor of the Appellees on all of these theories, except breach of the earnest money contract. The jury determined Westbrook and Woodlands were each 45% responsible for the damages and Appellees were 10% responsible. We affirm in part, reform in part, and reverse and render in part.

### Background

In late 1991, Appellees began looking for a new home in The Woodlands, Texas. A real estate agent for The Woodlands Custom Homes, Martha McCoin (later known as Martha Pircher), ("McCoin"), showed them several homes. Shortly thereafter, Appellees entered into "The Woodlands Homes New Home Earnest Money Contract" ("Contract") to purchase a new home from defendant Westbrook. In addition to Appellees and Westbrook, the

---

1. Woodlands is successor to The Woodlands Corporation, corporately and doing business as The Woodlands Custom Homes, one of the original defendants in this cause. Another defendant, The Woodlands Commercial Property Company, L.P. was non-suited. Appellees settled with Ted Bates Realty, Inc., doing business as Remax North and took a default judgment against Westbrook.

other signatory to the Contract was the Woodlands. Among the attachments to the Contract were two pertinent documents: (1) Addendum A, which was a list of corrections, created by Appellees and Westbrook during their "walk-through" of the home and also initialed as well as signed by the Appellees and Westbrook; and (2) a "Schedule of Specifications, Allowances and Construction Details for Westbrook Building Company, Inc." ("Specifications"), which also was initialed and signed by the Appellees and Westbrook. Woodlands did not initial or sign either Addendum A or the Specifications.

After closing the sale on January 17, 1992, the Appellees discovered various defects in the home. These included roof leaks, carpet stains, incorrectly sealed or stained floors, walls painted with the wrong brand of paint, warped boards, cracks in the walls and mortar, as well as bees in the wall and landscape or grading defects. Appellees also complained their home had less square footage than the Woodlands had represented it to have. When Westbrook did not respond to Appellees' complaints, they contacted Woodlands. However, Appellees found Woodlands to be unresponsive as well.

At the beginning of The Woodlands' development, its real property was encumbered with certain covenants and restrictions, i.e., the "Covenants, Restrictions, Easements, Charges and Liens of The Woodlands" ("Covenants"). The Covenants provide for establishment of The Woodlands Community Association ("Community Association"), and also for the Development Standards Committee ("Standards Committee") to be a function of the Community Association after 1992. At the time of Appellees' purchase, the Standards Committee was a function of Woodlands. The Standards Committee is charged with establishing rules and regulations governing the improvement of lots, including the form and content of plans and specifications. Also, the Covenants authorize the Standards Committee to promulgate building codes, and other codes such as fire and housing, unless and until a state political subdivision regulates such matters in The Woodlands. Further, the Standards Committee is authorized to issue Certificates of Compliance for structures or improvements upon request of a lot's owner.

Woodlands had inspected the Appellees' home on three occasions before the January 17 closing and on three occasions after closing, with the final inspection occurring on June 23, 1992. On June 23, a Woodlands inspector informed the Community Association that an occupancy certificate could be issued for the Appellees' home, with the exceptions of the rear door landing, as well as planting and grading standards. At Appellees' request, the Standards Committee issued a Certificate of Compliance ("Certificate") for the home on July 8, 1992. A little over a year later, Appellees filed their lawsuit.

■ In their motion for judgment on the verdict, Appellees requested the trial court to enter judgment on the theory of recovery permitting them the largest recovery, and thus elected to recover their statutory fraud claim. "When a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief." *Norwest Mortgage, Inc. v. Salinas,* 999 S.W.2d 846, 865 (Tex.App.—Corpus Christi 1999, pet. denied)(citing *Boyce Iron Works, Inc. v. Southwestern Bell Tel. Co.,* 747 S.W.2d 785, 787 (Tex. 1988)). Appellees' statutory fraud claim allowed recovery not only for actual damages, but also for exemplary damages, and attorney's fees.

## Causal Connection of Misrepresentations

In its first issue, Woodlands maintains the express language of the Contract precludes Appellees' reliance on any alleged misrepresentations by Woodlands as a matter of law. Woodlands correctly states the necessity for Appellees to show a causal connection between any alleged misrepresentations by Woodlands and Appellees' alleged damages. *See Prudential Ins. Co. of America v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 161 (Tex.1995). Woodlands argues "[t]he only conceivable fraudulent misrepresentations made by The Woodlands were the alleged oral statements by McCoin (which [Appellees] concede they received **before** signing the earnest money contract), and the Specifications and Addendum A ..." and further asserts the Appellees "could not have justifiably relied on any alleged representations that McCoin made to them before they entered into the Earnest Money Contract. Pursuant to the plain terms of the Earnest Money Contract, Plaintiffs disclaimed all warranties other than the H.O.W. warranty and manufacturer warranties."[2]

Woodlands relies on two Texas Supreme Court cases—*Prudential Ins. Co.,* 896 S.W.2d at 156, and *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171 (Tex. 1997)-and two cases from the courts of appeals—*C & A Invs., Inc. v. Bonnet Resources Corp.,* 959 S.W.2d 258, 264–65 (Tex.App.—Dallas 1997, writ denied) and *Airborne Freight Corp. v. C.R. Lee Enters.,* 847 S.W.2d 289, 297 (Tex.App.—El Paso 1992, writ denied). In each case, the courts found a party could not prove causation where it entered into a contract containing cautionary language specifically precluding reliance on contrary verbal representations. *Prudential,* 896 S.W.2d at 161; *Schlumberger,* 959 S.W.2d at 181–82; *C & A Invs., Inc.,* 959 S.W.2d at 264–5; *Airborne Freight,* 847 S.W.2d at 297.

**2.** The Contract's pertinent "plain terms" upon which Woodlands relies are:

7. PROPERTY CONDITIONS:

B. INCOMPLETE IMPROVEMENTS: All Improvements shall be completed with due diligence in accordance with the Plans and Allowances and Specifications signed by the parties hereto, incorporated herein with each Seller and Buyer retaining a copy thereof. To the extent that improvements have been made, Buyer hereby accepts these improvements in their present, as is, condition.

... The improvements shall be deemed to be substantially completed in accordance with the Plans and Specifications upon the final inspection and approval by all applicable governmental authorities and the lender and issuance of the Certificate of Compliance by the Development Standards Committee of The Woodlands.

C. WARRANTIES: Seller agrees to provide a ten (10) year limited warranty through the Homeowners Warranty Corporation of Houston (H.O.W.). Seller agrees to deliver or assign and pass through to Buyer at closing all manufacturer warranties that are assignable. No other express or implied warranties are contained herein, either oral or written. Buyer hereby acknowledges receipt of a specimen copy of the H.O.W. Warranty.

. . . .

19. AGREEMENT OF PARTIES: This contract contains the entire agreement of the parties and cannot be changed except by their written consent. The representations, obligations and warranties contained in this contract shall survive closing. There are no oral agreements, representations, conditions or warranties, expressed or implied, other than those contained herein.

. . . .

21. No representations made herein by Seller or made by Seller's sales representatives shall be construed as representations of The Woodlands Corporation, the developer of The Woodlands, and Buyer shall look solely to the Seller with regard to any matters arising under this Earnest Money Contract, it being understood that Seller is not the agent of The Woodlands Corporation. In order to be binding upon The Woodlands Corporation, any representations made by same must be in writing and appended to this Earnest Money Contract.

In *Prudential*, the purchaser of a commercial building alleged the seller misrepresented its condition and failed to disclose the building contained asbestos. 896 S.W.2d at 159. The purchaser was a "knowledgeable real estate investor who owned an interest in at least thirty commercial buildings," was president of a commercial property management firm, and "had bought and sold several large investment properties on an 'as is' basis." *Id.* In finding the buyer could not recover, the *Prudential* Court determined that, generally, an "as is" agreement negates the causation essential to recovery for a DTPA violation, fraud, and negligence. *Prudential*, 896 S.W.2d at 161. However, the *Prudential* Court set forth several exceptions to the general "as is," or "cautionary language" rule. Agreements containing such language will not bind a buyer who is induced to enter the agreement because of a fraudulent representation. *Id.* at 162. Nor will a buyer, who is entitled to inspect property, be bound by an "as is" agreement if the seller's conduct obstructs the buyer's inspection. *Id.* Further, we are to consider the "nature of the transaction and the totality of the circumstances surrounding the agreement." Moreover,

> [w]here the "as is" clause is an important part of the basis of the bargain, not an incidental or "boiler-plate" provision, and is entered into by parties of relatively equal bargaining position, a buyer's affirmation and agreement that he is not relying on representations by the seller should be given effect.... We think it too obvious for argument that an "as is" agreement freely negotiated by similarly sophisticated parties as part of the bargain in an arm's-length transaction has a different effect than a provision in a standard form contract which cannot be negotiated and cannot serve as the basis of the parties' bargain.

*Id.* at 162.

In *Schlumberger*, the parties disagreed about the feasibility and value of a joint venture diamond mining project. *See* 959 S.W.2d at 180–81. To resolve this dispute, the parties negotiated and then signed a release. During the course of the negotiations, "highly competent and able legal counsel represented both parties." *Id.* at 180. The *Schlumberger* disclaimer expressly stated that the appellees' counsel had fully explained the legal consequences of the release to them. *Id.* Also, the Court noted that the parties were "sophisticated business players." *Id.* Importantly, in *Schlumberger*, the very purpose of the release was to end the dispute about the value of the joint project. Therefore, specifically limiting its holding to the facts before it, the Court found the parties were bound by the disclaimer of reliance on representations regarding value. *Id.* at 180–81.

Both *C & A Investments* and *Airborne Freight*, a pre-*Prudential* case, follow the general rule set forth in *Prudential* and *Schlumberger* (i.e., that disclaimers, cautionary language, or "as is" clauses preclude reliance on alleged misrepresentations). *See C & A Invs., Inc.*, 959 S.W.2d at 262 (where a loan sale agreement provided for C & A "to rely solely upon its own investigation regarding the quality and character" of the loan and "not on any information, statement, representation or promise made or to be made" by appellees); *Airborne Freight*, 847 S.W.2d at 291, 297 (Contract terms providing that no representations had been made regarding the agreement's duration and that the agreement could be terminated by either party upon thirty days notice were not altered by a "broad, subjective assertion"

that a party would have a job as long as it did its job.).

Other post-*Prudential/Schlumberger* cases, however, apply the exception rather than the general rule. *See Fletcher v. Edwards*, 26 S.W.3d 66, 77 (Tex.App.—Waco 2000, pet. denied)(appellants' fraudulent inducement claim not precluded by cautionary language where parties were not attempting to resolve present dispute and appellants were neither represented by counsel, nor were they "sophisticated business players"); *Pairett v. Gutierrez*, 969 S.W.2d 512, 516–17 (Tex.App.—Austin 1998, pet. denied)(claim not precluded where "as is" clause did not relate to house's foundation or overall condition in contrast to *Prudential* where clause "clearly and unambiguously demonstrated the buyer's agreement to rely solely on his own inspection"); *Smith v. Levine*, 911 S.W.2d 427, 432 (Tex.App.—San Antonio 1995, writ denied)(causation not negated where buyer was not a knowledgeable real estate investor, the "as is" clause was silent on reliance issue, and buyers testified they relied on representations the house was in "excellent" condition and believed the "as is" clause referred only to problems that might develop in the future).

■ Here, having considered the "nature of the transaction and the totality of the circumstances surrounding the agreement," as required by *Prudential*, we find the express language of the Contract does not preclude Appellees' reliance on any alleged misrepresentations by Woodlands. Unlike in *Prudential*, paragraphs 19, 21, and 23 of the agreement were "boiler plate" provisions that were not negotiated, according to Jenkins. Further, he was told by McCoin the contract would not be altered and there was at least one other buyer waiting. *See Prudential*, 896 S.W.2d at 162. While Woodlands asserts the terms were not "boilerplate," it pro-

vides no record reference in support of its argument.

As to whether the agreement was negotiated by "similarly sophisticated parties as part of the bargain in an arm's-length transaction," Woodlands argues that Jenkins is a sophisticated business man. While Jenkins, being the general manager and founder of a business, is familiar with contracts, his primary duties are on the technology side of his microprocessor product design firm. Jenkins is not a structural engineer and does not normally read building constructions plans. Certainly, Jenkins was not a "knowledgeable real estate investor who owned an interest in at least thirty commercial buildings," nor was he president of a commercial property management firm, and neither "had [he] bought and sold several large investment properties on an 'as is' basis," as had the buyer in *Prudential*. 896 S.W.2d at 159.

Nor do we have here, as in *Schlumberger*, language that has the specific purpose of ending a dispute or, as in *Prudential*, language that clearly demonstrated the buyer's agreement to rely solely on his own inspection. *Prudential*, 896 S.W.2d at 156; *Schlumberger*, 959 S.W.2d at 181.

Appellee' first issue is overruled.

### Statutory Fraud Under Section 27.01(a)

Maintaining in issue two that none of Appellees' allegations concern a past or existing fact, Woodlands asserts the evidence is either legally or factually insufficient to support the jury's findings of statutory fraud under section 27.01(a) of the Texas Business and Commerce Code.

■ In reviewing a claim of the evidence's legal insufficiency, we consider only the evidence and inferences that tend to support the jury's finding, and disregard all evidence and inferences to the

contrary. *See Continental Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex. 1996); *Sears, Roebuck & Co. v. Kunze,* 996 S.W.2d 416, 421 (Tex.App.—Beaumont 1999, pet. denied)(citing *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992)). "A jury's finding will be upheld if more than a scintilla of evidence supports it. More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995)(quoting *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994))(other citations omitted). Every reasonable inference is indulged in favor of the prevailing party. *See Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998). We sustain a legal sufficiency point when: (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of a vital fact. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). But, if there is any evidence of probative force to support the finding, we overrule the legal insufficiency challenge. *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996).

■■■■■ To decide whether the evidence is factually sufficient, we must weigh all of the evidence in support of and contrary to the finding. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996); *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445

(Tex.1989). Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998). In addition, we remember the jury is the trier of fact, and, as such, is the sole judge of the credibility of witnesses and the weight to be attached to their testimony. *See id.; see Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex.1986).

Section 27.01 of the Texas Business and Commerce Code provides a statutory cause of action for fraud in real estate transactions. *See* TEX.BUS. & COM.CODE ANN. § 27.01 (Vernon 1987). Such fraud occurs if (1) a person makes a false representation of a past or existing material fact in a real estate transaction to another person for the purpose of inducing the making of a contract; and (2) the false representation is relied on by the person entering into the contract. *Id.* at § 27.01(a)(1). Further, the person who made the false representation is liable to the person defrauded for "actual damages" as well as "reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court." *Id.* at § 27.01(b), (e).[3] If the false representation is made with actual awareness of its falsity, exemplary damages may also be recovered. *Id.* at § 27.01(c).

■■■■■ Appellees argue that Woodlands misrepresented that (1) it inspected homes in The Woodlands to ensure compliance with the plans, specifications, and building code; (2) Woodlands inspected their home to ensure it was livable; (3) Woodlands conducted extensive inspections; (4) Woodlands inspected the homes in The

---

**3.** The jury charge did not contain a question based on Section 27.01(a)(2), which provides that real estate fraud also consists of a false promise to do an act, when the false promise is material, made with the intention of not fulfilling it and made to a person for the purpose of inducing that person to enter into a contract, and was relied on by that person.

Woodlands to ensure compliance with specifications such as those specifically contained in Plaintiff's Exhibit 4; (5) Woodlands stood behind the specifications in Exhibit 4 "one hundred percent" and verified compliance with the plans, specifications, and building code through the inspection process; and (6) Woodlands would ensure compliance with the plans, specifications, and building code before a final inspection permitted the issuance of a Certificate of Compliance.

Jim Jenkins testified McCoin told Laura and him during their initial visit with her that the homes built in The Woodlands were thoroughly inspected. During their second meeting with McCoin, Jim stated Appellees and McCoin discussed

> the specifications in the house, what went into the home, what kind of paint. At which point Martha McCoin handed [them] a packet of information stapled together.... [O]n the front cover it had The Woodlands Custom Homes Presents' ... [and had] a drawing of the home.... And at the bottom of that page it had ... Westbrook Building Company with a phone number. And the rest of the packet included what were specifications for the home.... The question was asked, are these the specifications as referred to in the covenants? The answer from Martha McCoin was "yes."

The specifications were admitted into evidence as plaintiffs' exhibit four.

Jim testified he believed The Woodlands Custom Homes or The Woodlands Corporation was providing the details McCoin was supplying about the home. Jim further testified that McCoin said, "The Woodlands would stand behind this home 100 percent," and Jim "was thoroughly convinced" Woodlands would do so after his discussions with McCoin. Though acknowledging he understood Woodlands

was not the builder, Jim stated he also was convinced Woodlands would "stand behind" the home because the Covenants were clear on requiring inspections and on the necessity of approval of plans and specifications by the Development Standards Committee, which actually was a function of Woodlands itself.

Jim further understood from McCoin that Woodlands knew what was in the home through the inspection process. McCoin also told Jim that Woodlands inspected the homes to ensure they were built according to plans and specifications, and, in addition, Woodlands would "back up those plans and specs to make sure that they were fulfilled." In fact, Jim testified he asked McCoin before closing if he should get his own inspector and she said "the homes were thoroughly inspected," and "it would be a waste of money." McCoin further told Jim the certificates of compliance were proof that homes were built according to plans and specifications and the building codes. While the Appellees were not allowed to buy a lot and have a builder of their choice build a home, McCoin assured Appellees the builders in the Woodlands were carefully selected.

Laura Jenkins also testified they talked with McCoin about the house's paint because having Sherwin–Williams paint was important to her; her father had always stressed that it was the paint to use. Sherwin–Williams was listed on the spec sheet for the home they bought, and Laura further testified McCoin told them the house was painted with Sherwin–Williams paint.

In McCoin's deposition, which was admitted at trial, she testified Woodlands required builders to have four inspections: (1) prior to clearing to ensure the trees were okay; (2) prior to pouring the slab to ensure the proper reinforcement was in the slab; (3) prior to sheetrock installation

to ensure the mechanicals were in place; and (4) at completion to show the home was considered livable. She also testified she was "just representing what the builder told [her]." She denied making specific representations to the Appellees that they would be wasting their money to have an independent inspection. She also said she would not have told a buyer that Woodlands inspects homes to make sure the builder does a good job. She did not recall telling them the home would be completed with Sherwin–Williams paint. She testified information about cosmetic details such as paint brand were furnished by the builder. She did not recall telling any prospective buyer that the inspection process would verify cosmetic details. She did not recall discussing leaky roofs with the Appellees. She denied telling them Woodlands thoroughly inspected homes to ensure compliance with construction plans.

Certainly, the record contains evidence of representations by McCoin that may have been false promises to perform future acts under section 27.01(a)(2) (i.e.,"The Woodlands would stand behind this home 100 percent"; "Woodlands would 'back up those plans and specs to make sure that they were fulfilled.' ") They are, however, beyond our review inasmuch as no applicable issue was presented to the jury, as indicated in footnote three herein. However, the record also contains evidence that McCoin made several misrepresentations to the Appellees regarding past or existing facts before they signed the earnest money contract.

On Appellees' first visit, the house was already largely completed; wallpaper was up and the house had been painted on the inside. Prior to the signing of the Contract, the home had already been inspected three times by Woodlands. And prior to the Contract's execution, McCoin told Jim Jenkins that Woodlands was inspecting the home to ensure it was built according to plans and specifications. Further, McCoin discouraged Jim from getting his own inspector by saying "it would be a waste of money" and "the homes were thoroughly inspected." In addition, McCoin told Jim the certificate of compliance was proof the home was built according to plans and specifications and the building codes.

However, these representations of McCoin's were shown to be false through testimony from several employees of Woodlands. John Fox, a building inspector for Woodlands, testified a home buyer should not rely on home inspections being performed by Woodlands, and that inspections by Woodlands would not necessarily ensure code compliance because the inspector is only on the job site for "three or four brief periods." Everett Coverdell, another Woodlands inspector, testified that the home's specifications would not even be known to the inspectors at the time of inspections, that inspectors were not inspecting to ensure compliance with the specifications, and furthermore, inspectors did not even look at the plans before conducting inspections. Thus, McCoin's statements that the already completed inspections ensured code, plan, and specification compliance clearly were misrepresentations.

Also, Laura Jenkins testified that prior to Contract's execution, McCoin told them the house was painted with Sherwin–Williams paint. However, Laura learned after closing that the paint was Monarch.

Jim Jenkins testified that the misrepresentations made by McCoin induced him to enter into the Contract. Further, he indicated they would not have purchased the home had they been aware that the inspection process did not verify compliance with the specifications.

On the other hand, McCoin testified she thought the things she was saying about

the inspection process were true, but denied saying Woodlands thoroughly inspected homes to ensure compliance with construction plans. She further denied or did not recall making specific representations regarding the paint or roof.

The record evidence clearly is legally sufficient, being far more than a scintilla to support the jury findings on statutory fraud under section 27.01(a)(1). Further, the evidence also is factually sufficient, considering that the jury, as trier of fact and sole judge of the credibility of the witnesses, was entitled to disbelieve McCoin's testimony and believe that of the Appellees. Issue two is overruled.

### Actual Awareness

■ In issue three, Woodlands contends the evidence is both legally and factually insufficient to support a finding of either statutory fraud under section 27.01(d) [4] of the Texas Business and Commerce Code or common law fraud. Woodlands maintains Appellees failed to offer evidence that Woodlands had actual awareness of the falsity of any alleged misrepresentation, or that Woodlands made any representation recklessly. The defrauding party's "actual awareness" of the falsity of a representation is a statutory requirement for recovery under section 27.01(d). See TEX. BUS. & COM.CODE ANN. § 27.01(d) (Vernon 1987). And under common law fraud, the defrauding party must make a false, material misrepresentation, which was known to be false or was made recklessly as a positive assertion without knowledge of its truth. See Insurance Co. of N. Am. v. Morris, 981 S.W.2d 667, 674 (Tex.1998).

The Appellees contend Woodlands knew McCoin's representations were false when they were made and further Woodlands was "actually aware" of the alleged fraud as Woodlands "admitted repeatedly through many of its employees that [Woodlands] was aware [it] did not inspect to ensure compliance with the plans, specifications, and building code for the purchaser's benefit."

■ The Texas Supreme Court recently defined "actual awareness" in a DTPA case, St. Paul Surplus Lines Ins. Co. v. Dal–Worth Tank Co., 974 S.W.2d 51, 53–54 (Tex.1998). There, the Court noted that under the DTPA, "actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness. TEX. BUS. & COM.CODE [ANN.] § 17.45(9) [Vernon 1987]." St. Paul Surplus, 974 S.W.2d at 53. The Court explained further that actual awareness "does not mean merely that a person knows what he is doing; rather, it means that a person knows what he is doing is false, deceptive, or unfair. In other words, a person must think to himself at some point, 'Yes, I know this is false, deceptive, or unfair to him, but I'm going to do it anyway.'" Id., at 54. We agree with the Austin Court of Appeals that the Court's treatment of "actual awareness" under section 27.01 of the Texas Business and Commerce Code "would be similar, if not identical," to that in St. Paul Surplus. See Scott v. Sebree, 986 S.W.2d 364, 371 (Tex. App.—Austin 1999, pet. denied).

■ As evidence of actual awareness, Appellees refer us to testimony from sev-

---

4. Section 27.01(d) provides a cause of action for real estate fraud against a person who, with actual awareness of a false representation or promise made by another person, fails to disclose the false representation or promise to the person defrauded, and further benefits from the false representation or promise. A person committing fraud under section 27.01(d) is liable for exemplary damages. TEX. BUS. & COM.CODE ANN. § 27.01(d) (Vernon 1987).

eral Woodlands' employees. Timothy Welbes, Woodlands' "head man" for Woodlands' residential division, agreed if there were problems with the construction of a home with respect to code compliance, the Standards Committee should not issue a certificate of compliance. Further, after Appellees had moved into their home, Jenkins learned from Welbes that the inspection reports basically were for the benefit of Woodlands, not the homeowner. Appellees also contend the testimony of Woodlands' inspectors John Fox and Everett Coverdell shows "actual awareness." Both Fox and Coverdell testified regarding the scope of Woodlands' inspections, as discussed above. Finally, Robert Heineman, director of planning for Woodlands testified he had never been to the home. However, he issued the certificate of compliance for the Jenkins' home, stating that the home substantially complied with the plans approved by the Development Standards Committee and the specifications. He relied on the inspection process and, specifically the document received from John Fox in order to sign the certificate in his capacity as chairman of the Committee.

Admittedly, these employees present a different view of Woodlands' home inspections as compared to McCoin's representations to Appellees. But no one refers to evidence (nor do we find any) that these employees knew McCoin was misrepresenting the nature of Woodlands' inspections or McCoin knew she was making misrepresentations. Here, the situation is similar to *Connell Chevrolet Co., v. Leak,* 967 S.W.2d 888 (Tex.App.—Austin 1998, no pet.) where an automobile dealership's salesman represented to a prospective buyer that a particular truck had an eight cylinder engine. Relying on the representation, the customer bought the truck. *Id.,* at 891. The customer did not learn his truck had only a six cylinder engine until he received his extended warranty from the underwriter. *Id.,* at 892–93. The *Connell* Court agreed the evidence supported the buyer's contention that someone at the dealership knew the truck had a six cylinder engine since the dealership actually provided the pertinent vehicle information to the underwriter. *Id.,* at 893. However, the court found no evidence showing "that those making the representations at the dealership ... were consciously aware that they were acting falsely, deceptively, or unfairly in representing the engine size to [the buyer]." *Id.* The court continued:

> While the dealership may have had the *means to determine* that the truck had a six-cylinder engine, that is not enough. The test enunciated in *St. Paul Surplus Lines* dictates that at least *someone* at the dealership must have had a subjective awareness of the falsity, deception, or unfairness before the dealership can be held to have acted knowingly. Here, there is no evidence, circumstantial or otherwise, that the salesman or the assistant manager *knew* the truck had a six-cylinder engine and, nevertheless, falsely represented it had an eight-cylinder engine. Nor is there evidence that someone else at the dealership knew the true facts but knowingly let them be misrepresented by the salesman and assistant manager. Nor is there evidence that anyone at the dealership consciously avoided learning the true facts. In sum, there is no evidence in this record to support the finding that the dealership acted knowingly.

*Id.* (emphasis theirs).

Here, while Woodlands may have had the "means to determine" misrepresentations were being made regarding its inspection program, there is no evidence anyone at Woodlands had a "subjective awareness of the falsity, deception, or unfairness" involved in McCoin's misrepre-

sentations. Further, there is no evidence McCoin knowingly made a false representation, nor that anyone at Woodlands "knew the true facts but knowingly let them be misrepresented by" McCoin. Nor is there evidence anyone at Woodlands consciously avoided learning the true facts. *See id.* Therefore, we find Woodlands was not actually aware of McCoin's misrepresentations and the evidence is legally insufficient to support a finding of statutory fraud under section 27.01(d) of the Texas Business and Commerce Code. Thus, we sustain issue three regarding the legal insufficiency of the evidence to support a finding of statutory fraud under section 27.01(d). The remainder of issue three, regarding the sufficiency of the evidence to support the jury's common law fraud finding is discussed below.

### Exemplary Damages

Having determined the "actual awareness" issue, we consider issue eleven, where Woodlands contends the evidence is legally and factually insufficient to support the jury's exemplary damages award. Woodlands assert Appellees presented no evidence that Woodlands' conduct was "particularly reprehensible" or that it acted with actual awareness of the falsity of any representation. We agree the evidence is legally insufficient.

To recover exemplary damages for statutory fraud under section 27 .01 of the Texas Business and Commerce Code, Appellees had to show Woodlands had "actual awareness" of the falsity of McCoin's representations. *See* Tex. Bus. & Com.Code Ann. § 27.01(c), (d) (Vernon 1987). Likewise, to recover treble damages under the DTPA, Appellees would have had to show that Woodlands acted "knowingly." *Id.*, at § 17.50(b)(1) (Vernon Supp.2001). Under the rationale of *St. Paul Surplus,* we consider the two standards to be the same.

*See St. Paul Surplus,* 974 S.W.2d at 53–54. As we already have determined Woodlands did not have actual awareness of the misrepresentations, we find the evidence is legally insufficient to support the jury's award of exemplary damages under section 27.01. *See Merrell Dow Pharms., Inc.,* 953 S.W.2d at 711.

Having ruled in Woodlands' favor on issue eleven's sufficiency of the evidence question, we need not consider its additional contention that the exemplary damages award is unconstitutionally excessive. *See* Tex.R.App.P. 47.1. Issue eleven is sustained as it relates to the legal insufficiency of the evidence to support the exemplary damages award.

### Mental Anguish

■ Issues eight and nine contest the mental anguish damages. In issue eight, Woodlands contends mental anguish damages are precluded in a "pure" property damage case, in the absence of "heightened circumstances." In issue nine, Woodlands contends the evidence of mental anguish is legally or factually insufficient to meet the standard for recovery of mental anguish damages.

■ In a DTPA case, *Parkway Co. v. Woodruff,* 901 S.W.2d 434 (Tex.1995), the Texas Supreme Court held that "an award of mental anguish damages will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine." *Id.,* at 444. But also under *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 54 (Tex.1997), we are required to "closely scrutinize" awards of mental anguish damages.

Appellees' evidence of mental anguish was presented through the testimony of Laura Jenkins, who stated: "I'm pretty

miserable.... [T]o the point ... I have already stated to my husband ... that I am moving out and Jim can have the house. I cannot live there anymore and put up—Jim's not there. He's at work ." She stated she had tried to deal with the problems by hiding them, (for example, putting a rug over the cracked tile floor), but that she "gave up." When asked if the house situation had caused her to be depressed, she said:

> Well, I don't know how you define depressed, but it's been very, very hard on me and I have kind of shut down. Yes, I guess you could say I have. Because when I [lived] in West University I was very involved with the Girl Scouts. In fact, I was a Girl Scout Leader for several years and also went on to a larger scale where I was on a committee that was in charge of 50 troops and so then I taught Sunday school and I can honestly say now that—yes, it has.

When asked if the situation had cause her any other emotional hardships, she responded:

> Well, I have cried a lot. I guess that's a sign of depression. I don't know labels. Of course, it's been very stressful on me because my life basically shut down the first—I would say January 21st because I didn't start going out there till August and I decided—August of '92. And then I just decided, you know, my children had to start a life because I was waiting for a repairman or just struggling with that and so I guess it was very stressful. It was a hardship, extreme hardship.

When asked how the situation had affected Jim, she testified:

> Well, I know it's been very hard on Jim because it's been very hard on me, so I vent my anger on him and so he has to handle that.... It's been extremely frustrating on Jim, very stressful on Jim.... [H]e's gotten angry, frustrated.

He made attempts through writing and to different various people in The Woodlands Corporation government or hierarchy or whatever.

Laura also stated that, when the lawsuit concluded, she was moving out of the house as she did not plan "to ever, ever live in The Woodlands again, never."

█ Laura's testimony informs us of the nature of her mental anguish (depression, stress, frustration) and Jim's (stress, anger, frustration), but much of her testimony is conclusory and fails to meet two of the three *Parkway* requirements by not offering evidence of the duration or severity of their mental anguish. *Parkway*, 901 S.W.2d at 444. Neither does she present evidence of a "substantial disruption" in their daily routine. *See id.* Appellees' complaints of mental anguish do not rise to the level of "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger." *Id.*, 901 S.W.2d at 444. "Simply because a plaintiff says he or she suffered mental anguish does not constitute evidence of the nature, duration, and severity of any mental anguish that is sufficient to show a substantial disruption of one's daily routine." *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 861 (Tex.1999).

In addition to *Parkway*, Appellees cite *Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730 (Tex.App.— Houston [14th Dist.] 1998, no pet.), to support their claim for mental anguish. However, *Seminole* does not aid Appellees' argument. There, the court held that "where a claim of mental anguish is based solely upon property damage resulting from gross negligence, recovery is contingent upon evidence of some ill-will, animus, or design to harm the plaintiff personally. We believe this rationale is more consistent with the general principle that emotional distress is not usually recoverable as

an element of property damages unless an improper motive is involved." *Id.*, at 757. Even if gross negligence were present here, we have seen no evidence of "some ill-will, animus, or design to harm the plaintiff personally." *Id.*

Thus, the evidence is legally insufficient to support the damages awarded for mental anguish, and issue nine is affirmed on that ground. We need not consider the issue eight regarding whether "heightened circumstances" are necessary for recovery of mental anguish damages in a "pure" property damage case. *See* Tex.R .App.P. 47.1.

### Cost of Repairs

In issue ten, Woodlands contends the evidence is legally or factually insufficient to support the jury's award of $50,000 for reasonable and necessary cost of repairs because the plaintiff cannot show a causal connection between their damages and the allegedly wrongful conduct.

To establish the right to recover repair costs, a claimant need only present sufficient evidence to justify a jury's finding that the costs were reasonable and the repairs necessary. *Ron Craft Chevrolet, Inc. v. Davis*, 836 S.W.2d 672, 677 (Tex.App.—El Paso 1992, writ denied). But, actual damages are limited to losses proximately caused by the wrongful conduct. *Welder v. Green*, 985 S.W.2d 170, 176 (Tex.App.—Corpus Christi 1998, pet. denied).

To establish the "reasonable and necessary costs of repairs," Appellees offered the testimony of three experts: Michael Gray, Leighton Jackson, and Wilson Wan. Michael Gray, a real estate inspector, testified regarding numerous problems he found during his inspection of the home: (1) the roof not being constructed according to code; (2) some purlin beams not being braced; (3) the roof decking showing no gaps or spacers; (4) damaged shingles; (5) leaks at the furnace and water heater vents; (6) no electrical receptacles near the furnace; (7) receptacles in the kitchen not being ground fault protected; (8) a large beam in the family room showing stress marks in the sheetrock and a minor crack in the sheetrock; (9) two rear doors not being weatherstripped; (10) upstairs bathtub dripping and draining slowly; (11) splices in the electrical wiring not being secured properly; (12) electrical boxes being recessed behind wood paneling; (13) unprotected wiring on top of walkways in the attic, receptacles in the kitchen not ground fault protected; (14) improper wiring to the furnaces; and (15) heating system repair needed for "drip leg" and gas line.

Leighton Jackson, another of Appellees' experts, was a real estate broker who had worked several years estimating the costs of repairs on foreclosed homes for the Resolution Trust Committee, Fannie Mae, and the FDIC. At trial, Jackson provided repair costs, which he testified were reasonable and necessary, for many of the problems noted by Gray. The total of these repairs was $29,936, to which Jackson added $6000 for "builder's mark-up," which Jackson estimated would be the additional cost to Appellees as they would not be able to obtain the same price that a contractor would charge a builder. Of this $35,936 total estimate by Jackson, Woodlands asserts $22,000 is for "cosmetic repairs."

Another of Appellees' experts, Wilson Wan, a civil engineer, examined the house for structural defects. In his opinion, the structural problems with the home would cost up to $17,000 to repair. Woodlands does not contend that these problems were cosmetic, or that inspections would not have revealed them.

The Appellees' experts provide sufficient evidence, both legally and factually, to establish the reasonable and necessary costs of repairs.

However, Woodlands further argues Appellees cannot show a causal connection between their alleged damages for "cosmetic repairs" and the allegedly inadequate inspections performed by Woodlands because the Appellees cannot reasonably claim to have expected Woodlands to inspect for such defects. Woodlands maintains the $50,000 jury award includes $22,000[5] for such "cosmetic" items, i.e., (1) refinishing hardwood floors (estimated by Jackson to cost $4500); (2) painting the interior and exterior of the home (estimated by Jackson to cost $9500); (3) replacing the carpet (estimated by Jackson to cost $800); (4) filling mortar cracks (estimated by Jackson to be $200); (5) adding fill dirt to the yard (estimated by Jackson to be $795); and (6) building a patio and patio exit (as estimated by Jackson in his trial testimony to be $1787). However, Woodlands does not argue these items were not part of the home's plans and specifications, which Jenkins understood to be the guide for Woodlands' inspectors.

■ Appellees established a causal connection between their damages and McCoin's misrepresentations regarding the quality of Woodlands' inspections. There is evidence McCoin told Jim Jenkins that Woodlands was inspecting the home to ensure it was built according to plans and specifications; further, she discouraged Jim from getting his own inspector. Moreover, Jim testified if he had been aware of Woodlands' view of the inspection process-i.e., it did not verify compliance with specifications, nor did it verify square footage-he would not have purchased the home, or at least not in the way he did. Thus, it is reasonable to conclude that, absent the misrepresentations, Appellees either would not have purchased this defective home at all, or, at least, would have taken further steps to investigate the home before purchasing it.

Thus, the evidence is also legally and factually sufficient to establish a causal connection between the damages and the misrepresentations. Issue ten is overruled.

### Woodlands' Other Issues

Issue four asserts that language in the earnest money contract providing representations must be made by Woodlands in order to be binding on it precludes Appellees from asserting the specifications as a basis for their fraud and/or DTPA claims. Woodlands devotes only two-thirds of a page to this argument and contends that the uncontroverted evidence shows the builder and not Woodlands prepared the specifications and that only the builder and the Appellees signed it. Therefore, they argue that as Woodlands was neither a party nor signatory to the document, it cannot be held accountable for its contents. Woodlands cites us to no authority applying this argument to a fact situation similar to this one, where McCoin misrepresented that Woodlands was inspecting the home to ensure it was built according to plans and specifications and the misrepresentations induced Appellees to enter into the real estate contract. To the extent Woodlands is accountable for compliance with the specifications, it is being so held as a result of McCoin's misrepresentations. Issue four is overruled.

---

5. However, the total amount for these contested items is $17,582, instead of $22,000, if based on Jackson's estimates. Woodlands does not refer us to evidence supporting its $22,000 amount.

In view of our earlier dispositions of issues three, nine, and eleven, we need not consider the remainder of Woodlands' issues.[6] *See* TEX.R.APP.P. 47.1. We have already determined Woodlands did not have "actual awareness" of the misrepresentations; thus, Appellees would not be entitled to treble damages under the DTPA. Furthermore, the jury's other favorable findings on the DTPA cause of action, common law fraud, or breach of the Covenants would entitle Appellees to no greater recovery than they have already received under the jury's favorable findings on costs of repair and attorney's fees under statutory fraud.

Therefore, we reverse the trial court's judgment as it relates to recovery for $70,000 in actual damages attributable to mental anguish, and exemplary damages of $1,282,500. Further, we reform the remaining judgment awards to be: $40,000 for costs of repairs (taking into account deductions from the $50,000 award for the ten percent liability attributable to Appellees, and the $5,000 paid in settlement); $35,000 for attorney's fees for trial of the case; $10,000 awarded for attorney's fees for appeal of the case and $24,856.50 for prejudgment interest. The remainder of the trial court's judgment is affirmed.

AFFIRMED IN PART, REFORMED IN PART; REVERSED AND RENDERED IN PART.

---

**6.** The remainder of the issues are: (1) the unresolved portion of issue three (relating to the legal and factual sufficiency of the evidence to support the jury's findings favorable to Appellees on common law fraud); (2) issue five, which maintains Appellees were not consumers under the DTPA with regard to the inspection process because it was a gratuitous service; (3) issue six, which asserts that the Covenants do not give rise to a duty of Woodlands to inspect Appellees' home; and (4) issue seven, which maintains the evidence was legally and factually insufficient to support the jury's finding that Woodlands breached the Covenants.