

NUMBER 13-07-00120-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

CELL COMP, L.L.C.,                                                                     **Appellant,**

**v.**

SOUTHWESTERN BELL WIRELESS,
L.L.C., SOUTHWESTERN BELL MOBILE
SYSTEMS, INC. AND SOUTHWESTERN
BELL WIRELESS, INC., CINGULAR
WIRELESS L.L.C., ET AL.,                                                              **Appellees.**

---

**On appeal from the 103rd District Court of Cameron County, Texas.**

---

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Benavides
Memorandum Opinion by Chief Justice Valdez**

Cell Comp, L.L.C. ("Cell Comp"), appellant, sued Cingular Wireless, L.L.C. ("Cingular"), appellee, for breaching an agency agreement, committing several torts, and violating provisions of Texas's Deceptive Trade Practices Act ("DTPA"). *See* TEX. BUS. & COM. CODE ANN. § 17.46 (Vernon Supp. 2007). Cingular filed a joint motion for traditional

and no-evidence partial summary judgment on Cell Comp's tort and DTPA claims, which the trial court granted. By seven issues, Cell Comp challenges the summary judgment. We affirm the judgment in part and reverse and remand in part.

## I. BACKGROUND

In July 2002, Cell Comp and Cingular entered into an authorized agency agreement under which Cell Comp agreed to market and sell Cingular wireless phone service and products in Hidalgo and Cameron Counties (the "market area"). Under the terms of the agreement, Cell Comp received a one-time commission for each new subscriber that it enrolled who remained with Cingular for 180 days. Cingular was also to pay Cell Comp a percentage of the revenue that it collected from Cingular subscribers who signed up for service through Cell Comp (the "subscription fee"). The agreement included "charge back" provisions whereby the commission payment corresponding to a subscriber who cancelled Cingular service within 180 days was debited from Cell Comp's account.

On December 23, 2003, Cell Comp sued Cingular for breach of contract, fraud, fraudulent inducement, violations of the DTPA,[1] conversion, conspiracy, and tortious interference with a business relationship with existing and future customers. According to Cell Comp's original petition, before the agreement was reached, Cingular employees represented to Cell Comp that Hidalgo and Cameron Counties had low cancellation rates and that Cingular would treat Cell Comp fairly in its marketing and promotion programs.

---

[1] Cell Comp alleged the following violations of the Deceptive Trade Practices Act: (a) making false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions, *see* TEX. BUS. & COM. CODE ANN. § 17.46(b)(11) (Vernon Supp. 2007); (b) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law, *see i.e. id* § 17.46(b)(12) (Vernon Supp. 2007); (c) misrepresenting the authority of a salesman, representative or agent to negotiate the final terms of a consumer transaction, *see id* § 17.46(b)(14) (Vernon Supp. 2007); and (d) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed, *see id* § 17.46(b)(24) (Vernon 2007).

Shortly after executing the agreement, Cell Comp alleged that it experienced a higher number of service cancellations than Cingular representatives had represented and thereby suffered unanticipated financial losses. Cell Comp also alleged that Cingular unilaterally changed its compensation and pricing allowances.

Cingular answered Cell Comp's suit with a general denial and asserted numerous defenses, including waiver and estoppel. After some discovery, Cingular moved for both traditional and no-evidence partial summary judgment on all of Cell Comp's claims except the breach of contract action. Cell Comp responded to Cingular's motions by arguing that fact issues existed and attached deposition testimony from four individuals who were familiar with the agreement's formation. The trial court granted Cingular a partial summary judgment without providing a rationale and severed Cell Comp's breach of contract claim. This appeal ensued.

## II. Discussion

By seven issues, Cell Comp complains that the trial court erred in rendering summary judgment on its claims for fraud, fraudulent inducement, violations of the DTPA, conversion, conspiracy, and tortious interference with a business relationship with existing and future customers.

### A. Standards of Review

Under a traditional motion for summary judgment, the movant must establish that no material fact issue exists and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); *Alaniz v. Hoyt*, 105 S.W.3d 330, 345 (Tex. App.–Corpus Christi 2003, no pet.); *Mowbray v. Avery*, 76 S.W.3d 663, 690 (Tex. App.–Corpus Christi 2002, pet. denied). After the movant produces evidence sufficient to show it is entitled to summary judgment, the non-movant

must then present evidence raising a fact issue. *See Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).

Texas Rule of Civil Procedure 166a(i) provides that "a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof." TEX. R. CIV. P. 166a(i). The trial court must grant the motion if the non-movant does not produce summary judgment evidence raising a genuine issue of material fact on each element challenged. *Id*.; *Mack Trucks v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The non-movant must produce more than a scintilla of probative evidence to raise an issue of material fact. *Oasis Oil Corp. v. Koch Ref. Co.*, 60 S.W.3d 248, 252 (Tex. App.–Corpus Christi 2001, pet. denied). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

We "must examine the entire record in the light most favorable to the non-movant, indulging every reasonable inference and resolving any doubts against the motion." *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006) (per curiam); *see City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). Moreover, "when a trial court's order granting summary judgment does not specify the ground or grounds relied on for its ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (quoting *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989)).

## B.     Fraud, Fraudulent Inducement, and DTPA Claims

By its first, second, and third issues, Cell Comp challenges the summary judgment

4

rendered on its fraud, fraudulent inducement, and DTPA claims. Cingular moved for summary judgment on those claims on the grounds that (1) there was no evidence that Cell Comp reasonably relied on Cingular's alleged representations, or, (2) as a matter of law Cell Comp could not have relied on Cingular's alleged representations because reliance was waived by the agreement.[2] In the alternative, Cingular argued that Cell Comp was estopped from claiming reliance on its representations by the terms of the agreement. Cingular filed the agreement as its only piece of summary judgment evidence, and it argued that two of the agreement's provisions establish Cell Comp's waiver of its reliance of any representations made by Cingular employees.

The first provision (hereinafter referred to as "acknowledgment provision"), contained in paragraph 2 of the agreement, reads:

> AGENT [Cell Comp] acknowledges that it has conducted an independent investigation of the business of selling CRS [cellular radio service] and any other Services that it will conduct pursuant to this Agreement. AGENT recognizes that entry into business as an AGENT of CINGULAR involves business risks and the AGENT'S success in such business will depend primarily upon its abilities and efforts. CINGULAR expressly disclaims the making of, and AGENT acknowledges that it has not received or relied upon, any guaranty, express or implied, as to the amount of commissions or other revenue that it may earn as a result of its agency relationship with CINGULAR and acknowledges that it has no knowledge of any representations relating to its agency relationship with CINGULAR by an officer, employee or agent of CINGULAR that are contrary to the terms herein. AGENT represents to CINGULAR, as an inducement to its entry into the Agreement, that AGENT has made no misrepresentation to CINGULAR in its application for appointment as a nonexclusive, Authorized Agent of CINGULAR or in any other manner.

The second provision of the agreement (hereinafter referred to as "interpretation

---

[2] Cingular raised only a reliance argument against Cell Comp's DTPA claims. *See Peltier Enters., Inc. v. Hilton*, 51 S.W.3d 616, 624 (Tex. App.–Tyler 2000, pet. denied) (noting that section 17.50(a)(1)(B) of the business and commerce code requires a plaintiff to prove that she reasonably relied on a false, misleading, or deceptive act or practice in order to obtain relief through the DTPA). We will, therefore, analyze Cell Comp's DTPA claims only with regard to Cingular's reliance argument. *See* TEX. R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal.").

provision"), contained in paragraph 26, states:

> The preambles and exhibits to this Agreement are a part of this Agreement, which constitute the entire agreement of the parties, and there are no other oral or written understandings or agreements between CINGULAR and AGENT relating to the subject matter hereof.

In its response to Cingular's summary judgment motion, Cell Comp argued that the agreement could not waive an intentional tort such as fraud because allowing a party to waive an intentional tort is unconscionable and against public policy. *See Solis v. Evins*, 951 S.W.2d 44, 50 (Tex. App.–Corpus Christi 1997, orig. proceeding) (finding that it would be "contrary to public policy" for a party to "prospectively contractually exculpate itself with respect to intentional torts"); *see also Atl. Richfield Co. v. Petroleum Personnel, Inc.*, 768 S.W.2d 724, 726 n.2 (Tex. 1989) (noting that indemnity against one's own intentional torts raises public policy concerns, but declining to rule on the issue). Cell Comp provided the trial court with excerpts from the deposition testimony of: (1) Daniel Sheppard, Cell Comp's manager; (2) Kerry Sheppard, the Cell Comp officer who executed the agreement; and (3) Adrian Hackett, a former Cingular account manager.

*1. Waiver of Reliance*

The elements of fraud are: (1) the defendant made a material representation; (2) the defendant knew the representation was false, or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the other party to act upon it; and (4) the other party actually and justifiably relied upon the representation, and (5) thereby suffered injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). Fraudulent inducement claims include fraud elements in addition to proof that one entered into a binding agreement as a result of the misrepresentation. *See Haase v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001) (providing

6

that "with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties").

Cingular challenges the reliance element of Cell Comp's fraud, fraudulent inducement, and DTPA claims by arguing that the agreement's terms waive reliance. The inclusion of a merger clause or a disclaimer of reliance in an agreement may, under certain circumstances, negate the element of reliance and thus preclude any fraud-like claim. *See, e.g., Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997) (holding disclaimer provision in settlement agreement defeated fraudulent inducement claim by negating reliance on pre-contractual representations). The factors to consider when assessing whether there is sufficient evidence of reliance include (1) the terms of the contract, (2) the circumstances surrounding its formation, (3) whether the parties were represented by counsel, and (4) whether the parties negotiated at arm's length. *See id*. at 179-80.

The *Schlumberger* case has been used to find waiver of reliance provisions ineffective against fraud claims when the waiver provisions constitute boiler-plate language in an agreement that is not the product of an arm's length transaction. *See Woodlands Land Dev. Co. v. Jenkins*, 48 S.W.3d 415, 422 (Tex. App.–Beaumont 2001, no pet.). In *Jenkins*, a home buyer sued her home builder for, among other things, statutory and common law fraud, breach of contract, and DTPA violations. *Id*. at 418. After a jury trial, the trial court rendered judgment in the home buyer's favor and awarded compensatory and exemplary damages. *Id*. The home builder appealed, arguing that the express language of the contract precluded the home buyer's reliance on any alleged misrepresentation by the home builder as a matter of law. *Id*. The Beaumont Court of Appeals, after examining the nature of the transaction and totality of circumstances, held

7

that the agreement did not waive the home buyer's reliance because the waiver provisions constituted "boiler-plate" language and the agreement was not the result of an arm's-length transaction. *Id*. at 422; *see also Johnson v. Perry Homes*, 1998 Tex. App. LEXIS 6749, at *28 (Tex. App.–Houston [14th Dist.] 1998, pet. denied) ("The disclaimers of reliance on representations in this case are part of the 'boiler-plate' provisions in the contracts, and there is no evidence they were part of the basis of the bargain between appellants and [appellee.]").

The agreement's terms are primarily "boiler plate" provisions that favor Cingular because they allow it to unilaterally change substantive portions of the agreement. For example, paragraph 9 provides that the "commission schedule may be revised or restructured by CINGULAR[,] in its sole discretion, upon thirty (30) days advance written notice to AGENT or by mutual agreement of the parties at any time." The agreement contains acknowledgment and interpretation provisions whereby Cell Comp disclaims any representation made by Cingular and the existence of any other agreement. The acknowledgment provision also provides that Cell Comp "has made no misrepresentations to" Cingular. Oddly, however, there is no clause guaranteeing Cingular's representations in the same fashion as the agreement guarantees Cell Comp's representations.

We find, however, that the second, third, and fourth *Schlumberger* factors do not point to a meaningful reliance disclaimer. Kerry, a Cell Comp officer, testified by deposition that she signed numerous copies of the agreement at Cingular's offices in Harlingen, Texas. Kerry also testified that she had not received previous drafts of the agreement and did not read the agreement before signing it. There is no evidence that an attorney for Cell Comp reviewed the agreement or that drafts were shuttled between Cell Comp and Cingular for review, edits, and negotiation. *See Jenkins*, 48 S.W.3d at 422 (noting that the

home builder asserted that the disclaimer of reliance provisions were not "boiler-plate," but did not provide a record reference in support of its argument). The record, therefore, reveals that Kerry, without the aid of counsel, executed an agreement that Cingular had drafted, and that the agreement waives reliance on any other representation or misrepresentation.

Having analyzed the record under the *Schlumberger* test, we conclude that the agreement does not effectively waive Cell Comp's allegation that it relied on Cingular's representations when entering into the agreement. *Schlumberger Tech. Corp.*, 959 S.W.2d at 181; *Jenkins*, 48 S.W.3d at 422; *see also Solis*, 951 S.W.2d at 50. We now turn to Cell Comp's summary judgment evidence to determine whether it raised a genuine issue of material fact regarding reliance.

*2.      Evidence of Reliance*

Daniel, Cell Comp's manager, testified by deposition that Ken Lee and Pete Renteria, Cingular's representatives,  told him that cancellation rates in the market area were three percent. According to Daniel, Cell Comp experienced a cancellation rate of seven to seven-and-a-half percent. Daniel blamed the high cancellation rates on Cingular's roaming policy, which he contends drove customers away from Cingular service. Daniel testified that Cingular's representations caused Cell Comp to enter into the contract when it could have pursued other business ventures.

Hackett, a Cingular account manager since November 1999, testified by deposition and affidavit about how Cingular's practices could result in agent "charge back" fees and a reduction in subscription fees. According to Hackett's affidavit:

> Shortly after starting with [Cingular], I came to understand that agents were not being compensated correctly. Every month, agents would complain to me about charge backs and their commission statement details.  The

9

agents did not have access to the customer accounts and maintenance system that Cingular kept. When the agents complained to me, I would research the activity on the commission statements. A large percentage of the time, the agents' payment was incorrect and the agents were incorrectly charged back. A majority of the time, the incorrect charge backs were due to a customer going to a company-owned store for maintenance. If a customer went to a company-owned store for account maintenance, such as a number change, rate plan change, or other services, the company-owned store would change the dealer code at the same time that the maintenance was performed, which created a charge back for the agent.

. . . .

Cingular knew that these problems existed and did not take steps to correct them. Cingular actually took steps to hide these problems from agents. Cingular restricted information that I could give to agents[,] telling me that it was confidential or proprietary, even though the subscriber was enrolled through the agent.

Hackett's affidavit testimony demostrates that Cingular was aware of the charge back situation and its financial impact on an agent since shortly after November 1999. Cell Comp executed Cingular's agreement in May 2002,[3] after receiving representations about allegedly low cancellation rates from Lee and Renteria.

Cell Comp produced summary judgment evidence that, when taken as true and viewed in the light most favorable to Cell Comp, raises a genuine issue of material fact on reliance.[4] We can point specifically to Daniel's testimony that Cingular made representations at the same time that Cingular, according to Hackett, knew of cancellation

---

[3] Cingular executed the agreement in July 2002.

[4] We distinguish the instant case from our holding in *In re Int'l Bank of Commerce.*, No. 13-07-693-CV, 2008 Tex. App. LEXIS 519, at *46-48 (Tex. App.–Corpus Christi Jan. 18, 2008, orig. proceeding). In that case the plaintiffs brought a breach of contract suit and request for injunctive relief against their bank. *Id*. at *13-15. The bank sought arbitration pursuant to the contracts, but its request to compel arbitration was denied by the trial court. *Id*. The plaintiffs argued that they could not be compelled to arbitration because the bank allegedly orally represented that the contracts did not contain any arbitration provisions. *Id*. at *7. We noted that the plaintiffs had executed fifty documents that contained arbitration provisions and held as a matter of law that they could not reasonably rely on prior oral representations that were contrary to the direct, clear, and unambiguous language contained in the fifty documents they signed. *Id*. at *48. The dispute in the instant case centers on a single contract, and the issue is not whether the dispute must proceed before an arbitrator rather than a court, but whether a claim exists at all. The cases, therefore, are distinguishable.

and subscription fee problems.

*3.    Estoppel*

Cingular's only other challenge to the reliance element of Cell Comp's fraud, fraudulent inducement, and DTPA claims is that Cell Comp is estopped, by the terms of the agreement, from using Cingular's representations as evidence of the reliance element. We, however, have previously held that it would be contrary to public policy to allow a party to prospectively exculpate itself from intentional torts by contract. *See Solis*, 951 S.W.2d at 50. And, in this case, we have concluded that the reliance disclaimer does not pass the *Schlumberger* test. It, therefore, makes no sense to bind a party by estoppel principles to a disclaimer that is not recognized by the facts of this case.

We hold that the agreement did not effectively waive Cell Comp's reliance on Cingular's representations, and that Cell Comp produced summary judgment evidence creating a fact issue with regard to its reliance. Additionally, we hold that Cell Comp cannot be estopped from claiming reliance on Cingular's representations. The trial court, therefore, erred in granting Cingular a summary judgment on Cell Comp's fraud, fraudulent inducement, and DTPA claims. We sustain Cell Comp's first, second, and third issues.

**C.    Conversion**

By its fourth issue, Cell Comp contends that the trial court erred in awarding summary judgment to Cingular on Cell Comp's conversion claim. In its original petition, Cell Comp alleged that Cingular committed conversion by "intentionally convert[ing] funds to which [Cell Comp was] justly entitled." Cingular argued that there was no evidence to support Cell Comp's conversion claim because Cell Comp cannot specify any property that has been converted.

Conversion consists of the wrongful exercise of dominion or control over another's

11

property in denial of or inconsistent with the other's rights in that property. *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446 (Tex. 1971). Money can be converted only if it is specifically identified and held in trust. *Chu v. Hong*, 249 S.W.3d 441, ___, No. 06-0127, 2008 Tex. LEXIS 225, at * 4 (Tex. Mar. 28, 2008); *Eckman v. Centennial Sav. Bank*, 757 S.W.2d 392, 398 (Tex. App.–Dallas 1988, writ denied) (providing that an action for the conversion of money will lie if the money can be identified as a specific chattel).

Cell Comp's conversion claim is for payment of fees that it is owed by Cingular under the terms of the contract. The fees that Cell Comp alleges it is owed are not identifiable, specific chattels capable of being converted; rather, they are alleged indebtedness that may be discharged by the payment of money generally. *See Newsome v. Charter Bank Colonial*, 940 S.W.2d 157, 161-64 (Tex. App.–Houston [14th Dist.] 1996, writ denied). The trial court, therefore, did not err in granting summary judgment on Cell Comp's conversion claim. Cell Comp's fourth issue is overruled.

**D.     Tortious Interference with a Contract and Prospective Business Relationships**

The trial court granted Cingular's summary judgment on Cell Comp's claims of tortious interference with a contract, and tortious interference with prospective business relationships on the grounds that the agreement provided that customers enrolled by Cell Comp became Cingular customers and that Cingular cannot tortiously interfere with its own contract. By its fifth and sixth issues, Cell Comp argues that the subscriber agreements that retail customers executed are contracts that Cingular interfered with by effectively canceling Cell Comp's participation through Cingular's cancellation procedures. We disagree.

The elements of tortious interference with a contract are: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that

proximately caused damage; and (4) actual damage or loss. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). Additionally, a successful claim of tortious interference must be based on the acts of an interfering third party—in other words, a party to a contract cannot tortiously interfere with its own contract. *See Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos., Inc.*, 217 S.W.3d 653, 668 (Tex. App.–Houston [14th Dist.] 2006, pet. denied); *Cent. Sav. & Loan Ass'n v. Stemmons Nw. Bank, N.A.*, 848 S.W.2d 232, 241 (Tex. App.–Dallas 1992, no pet.).

As we understand Cell Comp's tortious interference claims, Cell Comp alleges that Cingular's cancellation rates, allegedly due to roaming problems, interfered with Cell Comp's relationship with its current and future customers. The customers, however, subscribed to Cingular's service. By the terms of the agreement, Cell Comp became Cingular's nonexclusive agent, and it was Cingular's responsibility to provide subscribers with wireless service. Cell Comp's responsibility, as Cingular's agent, was to market Cingular's service. *See First Valley Bank of Los Fresnos v. Martin*, 55 S.W.3d 172, 183 (Tex. App.–Corpus Christi 2001, no pet.) ("An 'agent' is one who is authorized by a person or entity to transact business or manage some affair for that person or entity."). Cell Comp's allegations of high cancellation rates and roaming problems touch on Cingular's contractual obligations regarding wireless service quality and subscription fees, and in this case do not constitute evidence of contractual interference. Because a party to a contract cannot tortiously interfere with its own contract, and because there is no evidence of tortious interference, Cell Comp's tortious interference claims must fail. Cell Comp's fifth and sixth issues are overruled.

## E.    Conspiracy

In its seventh issue, Cell Comp argues that the trial court erred in granting summary

13

judgment on its conspiracy claim. Before the trial court, Cingular argued that Cell Comp could not maintain a conspiracy claim because Cell Comp, as a matter of law, could not maintain any independent tort action. *See Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (providing that a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable).

We have already held that the trial court erred by granting summary judgment on Cell Comp's fraud, fraudulent inducement, and DTPA claims. Thus, Cingular's sole argument in support of summary judgment on Cell Comp's conspiracy claim fails. We sustain Cell Comp's seventh issue.

### III. Conclusion

The trial court's judgment against Cell Comp on its claims of conversion and tortious interference with a contract and prospective business relationships is affirmed. The trial court's judgment against Cell Comp for its fraud, fraudulent inducement, conspiracy, and DTPA claims are reversed and those claims are remanded to the trial court for further proceedings consistent with this opinion.

_____
ROGELIO VALDEZ,
Chief Justice

Memorandum Opinion delivered and
filed this the 19th_day of June, 2008.

14