**Opinion filed October 16, 2020**



## In The

# Eleventh Court of Appeals

_____

## No. 11-18-00215-CV

_____

## ROBERT COX ET AL., Appellants

## V.

## HELENA CHEMICAL COMPANY, Appellee

**On Appeal from the 32nd District Court**

**Mitchell County, Texas**

**Trial Court Cause No. 16643**

### O P I N I O N

This appeal arises from a suit filed by Appellants[1] against Helena Chemical Company[2] for damages allegedly caused to Appellants' cotton crops by drift from the aerial application of Sendero, an herbicide that contains clopyralid and aminopyralid and is toxic to broadleaf plants such as cotton. Appellants asserted

---

[1]Appellants are Robert Cox, Tanner Cox, Cox Farms, James Cox Trust, David Stubblefield, Brooks Wallis, Russell Erwin, Jack Ainsworth, Loren Rees, Tyson Price, Rushell Farms, and Hoyle & Hoyle.

[2]Although Appellants originally sued other defendants as well, Helena was the only remaining defendant at the time of the final judgment.

claims against Helena for negligence, gross negligence, negligence per se, and trespass. The trial court granted Helena's motions for partial summary judgment on Appellants' claims for mental anguish, gross negligence, malicious conduct, and punitive damages. The trial court later granted Helena's motion to strike the opinions of Appellants' experts as to causation and Helena's no-evidence motion for summary judgment. The trial court rendered judgment that Appellants take nothing on all of their claims against Helena. We affirm in part and reverse and remand in part.

Appellants present three issues on appeal. Appellants contend that the trial court erred (1) when it granted partial summary judgments related to trespass, emotional distress, and punitive damages; (2) when it granted Helena's motion to strike expert witness evidence on causation; and (3) when it granted Helena's motion for a no-evidence summary judgment on the element of causation.

Before reaching the propriety of the summary judgment, we must first address Appellants' second issue, which requires us to determine whether the trial court abused its discretion when it struck the opinions and testimony of six of Appellants' experts. *See Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84–85 (Tex. 2018) (citing *Starwood Mgmt., LLC v. Swaim*, 530 S.W.3d 673, 678 (Tex. 2017)); *see also E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). A trial court abuses its discretion if it acts without reference to any guiding rules or principles. *Robinson*, 923 S.W.2d at 558; *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. With regard to the admissibility of expert testimony, the Texas Supreme Court has

2

held that, in addition to showing that an expert witness is qualified and that the expert's testimony is relevant to the issues in the case, Rule 702 requires the proponent to show that the expert's testimony is based upon a reliable foundation. *Robinson*, 923 S.W.2d at 556; *see, e.g.*, *Foust v. Estate of Walters*, 21 S.W.3d 495, 504–05 (Tex. App.—San Antonio 2000, pet. denied) (upholding admission of expert testimony in negligence suit against aerial applicator for damages allegedly caused to cotton crops from herbicide drift). "Admission of expert testimony that does not meet the reliability requirement is an abuse of discretion." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347–48 (Tex. 2015) (quoting *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006)). Courts generally determine the reliability of an expert's chosen methodology by applying the *Robinson* factors. *Id.* at 348. The *Robinson* court explained:

> There are many factors that a trial court may consider in making the threshold determination of admissibility under Rule 702. These factors include, but are not limited to:

> (1) the extent to which the theory has been or can be tested;

> (2) the extent to which the technique relies upon the subjective interpretation of the expert;

> (3) whether the theory has been subjected to peer review and/or publication;

> (4) the technique's potential rate of error;

> (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

> (6) the non-judicial uses which have been made of the theory or technique.

> We emphasize that the factors mentioned above are non-exclusive. Trial courts may consider other factors which are helpful to determining the reliability of the scientific evidence. The factors a trial court will find helpful in determining whether the underlying theories and techniques of the proffered evidence are scientifically reliable will differ with each particular case.

3

. . . .

The trial court's role is not to determine the truth or falsity of the expert's opinion. Rather, the trial court's role is to make the initial determination whether the expert's opinion is relevant and whether the methods and research upon which it is based are reliable. There is a difference between the reliability of the underlying theory or technique and the credibility of the witness who proposes to testify about it. . . .

*Robinson*, 923 S.W.2d at 557–58 (citations and footnote omitted).

The *Robinson* relevance and reliability requirements apply to all expert testimony, but the *Robinson* factors cannot always be used in assessing an expert's reliability. *Cooper Tire*, 204 S.W.3d at 801. Nevertheless, "there must be some basis for the opinion offered to show its reliability." *Id.* (quoting *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998)).

Expert testimony has been held to be unreliable "if there is too great an analytical gap between the data on which the expert relies and the opinion offered." *Gharda USA*, 464 S.W.3d at 349 (quoting *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 904–05 (Tex. 2004)). Whether an analytical gap exists is largely determined by comparing the facts the expert relied on, the facts in the record, and the expert's ultimate opinion. *Id.* We do not determine if the expert's opinions are correct, but instead, we determine only whether the analysis used to reach the opinions is reliable. *Id.* (citing *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002)).

The Texas Supreme Court applied an analytical-gap analysis when it addressed the reliability of the testimony of an accident reconstruction expert in *TXI Transportation Co. v. Hughes*, 306 S.W.3d 230, 235 (Tex. 2010). The court noted that the *Robinson* "methodology" factors are difficult to apply to accident reconstruction testimony in vehicular accident cases and that it is appropriate "to analyze whether the expert's opinion actually fits the facts of the case." *TXI*, 306

4

S.W.3d at 235 (citing *Ramirez*, 159 S.W.3d at 904–05). In doing so, courts determine "whether there are any significant analytical gaps in the expert's opinion that undermine its reliability." *Id.* An analytical gap arises when the expert improperly applies otherwise sound principles and methodologies, the expert's opinion is based on incorrectly assumed facts, or the expert's opinion is based on tests or data that do not support the conclusions reached. *Gharda USA*, 464 S.W.3d at 349.

In the case before us, Helena filed a Motion to Strike Plaintiffs' Expert Opinions on Causation. Helena asserted in its motion to strike that "many of Plaintiffs' experts are not qualified to make the specific opinions they seek to offer, their opinions are not based on any reliable evidence or scientific principles, and none of the experts rule out potential alternative causes of Plaintiffs' alleged crop damage." The trial court granted Helena's motion and struck "all causation opinions or testimony offered by Ronald Halfmann, Daylon Royal, Tracey Carrillo, Paul Rosenfeld, Ron Roberts and/or Paul Ward."

Approximately one month before Helena filed its motion to strike, the parties had entered into a Rule 11 agreement "regarding the opinions and deposition testimony" of Appellants' retained experts: Halfmann, Royal, Rosenfeld, Carrillo, Roberts, and Ward. *See* Tex. R. Civ. P. 11. In the agreement, which was signed by counsel for both Helena and Appellants and was attached as an exhibit to Helena's no-evidence motion for summary judgment and Helena's motion to strike, the parties agreed that the deposition testimony of Halfmann, Royal, Rosenfeld, Carrillo, Roberts, and Ward was "admissible" with respect to each expert's qualifications and experience, the methodology employed to reach each expert's opinions, the scientific bases for those opinions, the scope and type of evidentiary bases for those opinions, and the scope and extent of those opinions. The agreement indicates that the parties were "not agreeing that the actual supporting factual evidence relied on

5

by any expert . . . or the actual opinions reached by any expert" were relevant or admissible.

Whether Appellants' causation experts were justified in relying on the "supporting factual evidence" is, in this case, an issue of fact. The record reflects that, as stipulated by Helena in the Rule 11 agreement, the experts retained by Appellants were well qualified and experienced in their fields of expertise: Halfmann—agriculture, aerial application of chemicals, and drift and pesticide investigations; Royal—aerial application of herbicides; Rosenfeld—chemistry and herbicides; Carrillo—agriculture, plant pathology, herbicides, and drift; Roberts—meteorology; and Ward—agriculture.

Roberts and Ward did not offer an expert opinion as to causation. In his expert report, Roberts expressed an opinion about the weather conditions at the target pastures from July 1 through July 4, 2015, based on the data from the Mesonet stations on either side of the target pastures. Ward conducted germination testing on soil samples taken from Appellants' fields after they harvested their 2015 crops. Ward preserved his records on a graph that included a series of grades assigned to each sample at regular intervals after planting, the longitude and latitude of the field from which the particular sample was gathered, and the identity of the farmer associated with that field. Ward's germination testing revealed that no germination occurred in a significant number of the samples and that, in the vast majority of the samples, "symptoms of Sendero damage appeared after[]" germination. As noted by Helena in its motion to strike, "Ward unequivocally disclaimed any knowledge or opinions regarding whether herbicide in fact drifted from the applications in question to any of [Appellants'] fields." Because Roberts and Ward did not offer an expert opinion that Helena caused the damage to Appellants' cotton, the trial court erred in excluding their testimony.

6

Royal mainly addressed the applicable standards of care and the breach of those standards by Helena and the pilots who applied the Sendero for Helena. In one sentence in his report, Royal states: "Historical drift events reveal that Sendero drifted to farmers' fields." Royal had personal experience as an applicator in a historical drift event, but to the extent that the above sentence constitutes an expert opinion that Helena's aerial application of Sendero caused Appellants' damages, that opinion was inadmissible based on the analytical gap in Royal's conclusion as to causation in this case based on "[h]istorical drift events." However, the crux of Royal's expert report related to the standards of care and the breach of those standards by Helena and the pilots—an opinion that Royal was well-qualified to give and that was based on his knowledge of crop dusting, on the relevant weather data, and on the planes' Sat-Loc records, among other factors. Thus, Royal's testimony should not have been excluded in its entirety but, rather, only to the extent that Royal attempted to offer an opinion that Sendero drifted from Helena's application site to Appellants' fields.

Rosenfeld opined largely as an expert on Sendero and its toxic and lasting effects on cotton. Rosenfeld also touched on the issue of drift and indicated that "Sendero drift from aerial application of pesticide damaged cotton." Rosenfeld relied on the results of the tests from the samples taken by Appellants, Helena, and Cory Pence (a pesticide inspector and regional education specialist for the Texas Department of Agriculture), all of which showed the presence of clopyralid. Rosenfeld also relied upon the TDA report that was prepared by Pence, Appellants' reports of damage to their cotton, and the related photographs and imagery taken of such damage. He determined that Appellants' reports were consistent with the characteristics of aerial dispersion of Sendero.

Halfmann had almost forty years of experience in the profession of or the regulation of the aerial application of chemicals for agriculture in Texas. For fifteen

years, he was an operator and pilot that specialized in rangeland brush control on large ranches in West Texas—the same type of application conducted by Helena on the Spade Ranch. For twenty years, Halfmann was employed by the Texas Department of Agriculture, where he co-authored the department's Pesticide Complaint Investigation Manual, trained inspectors and staff on the prevention of spray drift, and provided label advisory language for the Environmental Protection Agency's "Spray Drift Task Force." Halfmann also worked on the technical aspects of advanced computer modeling for drift prevention programs and investigated hundreds of drift events similar in cause or effect to those alleged in this case. Halfmann indicated that drift modeling via computer simulation revealed the extraordinary risk of applying Sendero in the weather conditions that existed at the time of the aerial application in this case. Halfmann stated that computer programs for drift modeling were not typically designed to consider the high wind speeds that occurred during the aerial application in this case. Halfmann indicated that he had worked with the EPA when it came out with its spray drift model; he explained that the EPA's spray drift model was designed to determine "the probability of a product drifting," not the distance that it would drift.

Carrillo—who has a doctorate degree in Environmental Plant Sciences, Agronomy; a master's degree in Entomology, Plant Pathology and Weed Science; and a bachelor's degree in Rangeland Management—has extensive professional experience with herbicide applications. He has conducted research on cotton for more than thirty years and is a certified crop advisor with education and training in spray drift.

Halfmann and Carrillo offered extensive testimony and opinions related to causation. Halfmann and Carrillo determined that the damage to Appellants' cotton crops resulted from a large-scale aerial application of clopyralid during early July. During the first week of July, Helena aerially applied over 3,300 gallons (over twelve

8

tons) of Sendero to target mesquite trees on more than 15,000 acres of the Spade Ranch. The pilots made over 600 runs to apply the Sendero along several miles of land that was situated generally on a west to east axis. Halfmann and Carrillo relied on weather data, Sat-Loc flight records, lab tests showing the presence of clopyralid in some of Appellants' cotton plants, descriptions and hundreds of pictures of Appellants' damaged cotton plants, a map showing the locations of the application sites and the affected fields, and a short video depicting the actual aerial application of chemicals at the Spade Ranch in early July. Despite adverse weather conditions, the pilots, at times, sprayed the herbicide while at least thirty feet above the ground. To conclude that it was Helena's aerial application that caused the damages, Halfmann and Carrillo relied on Pence's visual observations and investigation to rule out the possibility that there was another large-scale aerial application of clopyralid at the relevant time in the area of Appellants' cotton fields.

While we agree with Helena that expert opinions as to causation are not admissible if those opinions lack foundational data or are based on mere assumptions, we do not agree that the opinions on causation that were provided by Appellants' experts lacked foundational data or were based on mere assumptions or invalid assumptions. When an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). Appellants' causation experts may have based their opinions on some disputed facts, but they did not base their opinions on assumed facts that varied from actual, undisputed facts. Although Halfmann, Carrillo, and Rosenfeld could not specifically trace the purported drift of clopyralid from the Spade Ranch to Appellants' cotton fields, they provided a reliable scientific basis for their opinions that Appellants' cotton crops were damaged by a large-scale aerial application of clopyralid to the south of Appellants' fields. Relying on Pence's

9

investigation and observations that Helena's aerial application of Sendero, which was done in conditions that exacerbated drift, was the only such large-scale application at the relevant time and place, they concluded that the damage to Appellants' cotton crops was caused by Helena. We see no analytical gap in such a conclusion. We sustain Appellants' second issue as to Appellants' expert witnesses with one exception: that exception being Royal's attempt to offer an opinion that Sendero drifted from Helena's application site to Appellants' fields.

In their third issue, Appellants assert that the trial court erred when it granted Helena's no-evidence motion for summary judgment. After an adequate time for discovery, a party may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). We review a no-evidence motion for summary judgment under the same legal sufficiency standard as a directed verdict. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). Under this standard, the nonmovant has the burden to produce more than a scintilla of evidence to support each challenged element of its claims. *Id.* Evidence is no more than a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). Courts must consider the evidence in the light most favorable to the nonmovant, indulging every reasonable inference in favor of the nonmovant and resolving any doubts against the movant. *Merriman*, 407 S.W.3d at 248. "We review the trial court's grant of summary judgment de novo." *Lujan*, 555 S.W.3d at 84 (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)).

Here, Helena asserted in its motion that there was no evidence as to the element of causation. Helena argued below and urges on appeal that, to prove

causation, Appellants must establish that Sendero, an herbicide that contains clopyralid, physically traveled from the application sites to "each" of the 111 cotton fields that Appellants claim were affected. According to Helena, the "causation elements must be established—and summary judgment must be decided—independently for each allegedly affected field." We disagree with such a contention. First, each field does not comprise a separate plaintiff. Second, nonmovants need not marshal all their proof in response to a motion for summary judgment; they "need only point out evidence that raises a fact issue on the challenged elements." *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

In response to Helena's no-evidence motion, Appellants relied on the affidavits of Halfmann and Carrillo and various exhibits. The summary judgment evidence presented by Appellants indicated that their cotton crops in Mitchell County were damaged by clopyralid or Sendero, that the application of clopyralid or Sendero had to have occurred around the first week of July 2015, that the application had to have been a widespread aerial event, that no other aerial applications were observed during the applicable timeframe, and that Pence had driven the area around the affected fields to look for any other potential applications of clopyralid or Sendero but had found none. According to Appellants' summary judgment evidence, Pence traced the damage symptoms to the Spade Ranch, where over 3,300 gallons of Sendero had been applied aerially to mesquite trees on July 1, 2, 3, and 4 by two planes in conditions that were, at times, adverse to the aerial application of chemicals. The adverse conditions included high winds blowing in the direction of Appellants' various cotton fields; high temperatures; the release of chemicals while the plane was flying above the recommended height; and the application of an inappropriate amount of chemicals, which would have created smaller droplets or "driftable fines" more susceptible to drifting "miles and miles" away from the target field.

Helena has not provided any authority that would lead this court to conclude that the experts' opinions should have been struck or that a take-nothing summary judgment was appropriate due to Appellants' failure to present evidence specifically related to each of the 111 cotton fields for which Appellants sought damages. A no-evidence summary judgment is not appropriate if the nonmovant presents "some" evidence that raises an issue of fact related to the challenged element. We believe that, as set forth above, Appellants presented summary judgment evidence that raised an issue of fact on the element of causation. Therefore, we sustain Appellants' third issue.

In their first issue, Appellants contend that the trial court erred when it granted partial summary judgments in favor of Helena on issues related to Appellants' claims for trespass, emotional distress damages, and punitive damages. The record reflects that Helena filed combined traditional and no-evidence motions for partial summary judgment related to these matters. In its motion for partial summary judgment on Appellants' claims for gross negligence, malicious conduct, and punitive damages, Helena set forth at least thirty grounds upon which it moved for summary judgment. In each of its nine motions for partial summary judgment on the individual Appellants' claims for mental anguish, Helena presented several grounds for summary judgment. We will address only those summary judgment grounds necessary to the disposition of this appeal. *See* TEX. R. APP. P. 47.1.

With respect to the no-evidence grounds, we will apply the well-recognized standard for no-evidence summary judgments that we applied to Appellants' third issue. *See Merriman*, 407 S.W.3d at 248. With respect to the traditional summary judgment grounds, we observe the following well-recognized standard. A party moving for traditional summary judgment bears the burden of proving that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257

(Tex. 2017).  For a defendant to be entitled to a traditional summary judgment, it must either conclusively negate at least one essential element of the cause of action being asserted or conclusively establish each element of an affirmative defense.  *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).  Evidence is conclusive only if reasonable people could not differ in their conclusions.  *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).  If the movant initially establishes a right to summary judgment on the issues expressly presented in the motion, then the burden shifts to the nonmovant to present to the trial court any issues or evidence that would preclude summary judgment.  *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979).  In reviewing both traditional and no-evidence summary judgments, we consider the evidence in the light most favorable to the nonmovant, indulge every reasonable inference in favor of the nonmovant, and resolve any doubts against the movant.  *Merriman*, 407 S.W.3d at 248; *City of Keller*, 168 S.W.3d at 824.

When it granted Helena's motions for partial summary judgment, the trial court did not specify whether it did so on traditional or no-evidence grounds.  When a trial court does not specify the grounds upon which it grants summary judgment, appellate courts will affirm if any of the theories are meritorious.  *Knott*, 128 S.W.3d at 216.  Generally, we consider the no-evidence grounds first.  *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017).  If the nonmovant fails to overcome its no-evidence burden on any claim, we need not address the traditional grounds related to that claim.  *Id.*

With respect to Appellants' request for punitive damages, Helena asserted in its motion for summary judgment that there was no evidence of any gross negligence or malice that could be attributed to Helena.  Helena specifically asserted, among other things, that there was no evidence of the following: that Helena authorized or ratified any gross negligence or malicious conduct of the aerial applicators or of

Helena's employee Jeffery Fritz Gerhard, that Gerhard or the applicators were unfit, that Helena was grossly negligent or acted maliciously when it hired Gerhard or the applicators, and that Gerhard or any of the applicators was a vice principal of Helena. Helena also asserted that the evidence established as a matter of law that Gerhard was not the kind of employee who could authorize or ratify grossly negligent or malicious conduct on behalf of Helena under Texas law and that neither the applicators nor Gerhard was a vice principal of Helena.

The summary judgment evidence reflects that Helena, via Gerhard, hired Lauderdale Aerial Spraying to perform an aerial application of herbicide on the Spade Ranch in Mitchell County in July 2015. Helena, a member of the Texas Aerial Applicators Association, had ground rigs for its application of chemicals but did not, at that time, have aerial capabilities. Doug Ripley and Clyde Kornegay piloted the two planes used for the aerial application at the Spade Ranch in 2015. Kornegay and Ripley were not employees of Lauderdale.

Gerhard explained the process as follows:

> The way it works on these jobs, any of the jobs that I do with these end users, ranchers, is that I set it up. I meet with the grower. We talk about what products are going to be used, what he's trying to control, and then we agree on how many acres. We get it mapped out. And then I line it up with the applicator that I feel is best suited to do the application.
>
> And once we get to the job site, . . . we turn it over to the applicator . . . .

Gerhard indicated that the ultimate responsibility for the mitigation of drift belongs to either the applicator, which Gerhard said was "Lauderdale" in this case, or "the pilots."

Kornegay and Ripley agreed with Gerhard that the applicators have the ultimate responsibility to prevent drift. According to Ripley, however, he, Kornegay, and Gerhard made a "collective decision" at one point to not spray a

14

particular area of the Spade Ranch because of the drift potential. The pilots and Gerhard also had discussions about suspending the application at the Spade Ranch, but the application was not suspended. Ripley indicated that Gerhard and the pilots "worked as a team" but that Gerhard was "in charge" and had the "power to say stop." Furthermore, Gerhard monitored the weather, informed the pilots of the wind conditions, monitored the mixing of the chemicals, and watched the pilots spray. Gerhard admitted that he used his handheld Kestrel 3000, a wind meter, while at the Spade Ranch during the July 2015 aerial application of Sendero. Helena supplied the chemicals used in the aerial application, delivered those chemicals to the Spade Ranch, informed Lauderdale of the "window" of time in which the application needed to occur (taking into account tree growth, ground temperature, and weather conditions), and told Lauderdale at what rate and volume to apply the Sendero.

Gerhard and the pilots knew the winds were out of the south and knew that cotton crops were located north of the Spade Ranch. Gerhard was familiar with Sendero and its warning label.

The purpose of punitive damages is to protect society by punishing the offender; the purpose is not to compensate an injured party. *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997). Consequently, punitive damages are available only if the harm suffered by the claimant resulted from fraud, malice, or gross negligence. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (West 2015); *see also id.* § 41.001(5), (6), (7). Because Appellants asserted a claim for trespass as well as gross negligence, we note that, to recover punitive damages for the tort of trespass, the trespass must have been committed maliciously. *Wilen v. Falkenstein*, 191 S.W.3d 791, 800 (Tex. App.—Fort Worth 2006, pet. denied). "Malice" is defined as "a specific intent by the defendant to cause substantial injury or harm to the claimant." CIV. PRAC. & REM. § 41.001(7).

15

A corporation is liable in punitive damages for malice or gross negligence only if the corporation itself committed the malicious or grossly negligent act. *Qwest Int'l Commc'ns, Inc. v. AT & T Corp.*, 167 S.W.3d 324, 326 (Tex. 2005); *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998). The Texas Supreme Court has developed tests to distinguish between acts that are solely attributable to agents or employees and acts that are directly attributable to the corporation. *Ellender*, 968 S.W.2d at 921; *Hammerly Oaks*, 958 S.W.2d at 391. A corporation is liable for punitive damages if it authorizes or ratifies an agent's malice or gross negligence, if it maliciously or grossly negligently hires an unfit agent, or if the acts of malice or gross negligence were committed by a vice principal of the corporation. *Qwest*, 167 S.W.3d at 326; *Ellender*, 968 S.W.2d at 921–22; *see Hammerly Oaks*, 958 S.W.2d at 389. The term "vice principal" encompasses the following: "(a) corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom the master has confided the management of the whole or a department or a division of the business." *Ellender*, 968 S.W.2d at 922 (citing *Hammerly Oaks*, 958 S.W.2d at 391). To determine whether acts are directly attributable to the corporation, courts do not simply judge individual elements or facts but, rather, should review all the surrounding facts and circumstances to determine whether the corporation itself acted with malice or gross negligence. *See id.* (citing *McPhearson v. Sullivan*, 463 S.W.2d 174, 176 (Tex. 1971)).

The summary judgment evidence reflects that Gerhard averred that he was employed by Helena in "a sales role" and called himself a "range and pasture specialist." Gerhard and the vice president of Helena's Southern Business Unit both averred that Gerhard had never been a corporate officer of Helena; had never had the authority to hire or fire Helena employees; had never had responsibility for or control over Helena's safety rules, equipment, or workplace conditions; and had

16

never held a management position for Helena or for any department or division within Helena. Although Appellants claim that Gerhard was a "manager" and that Helena ratified Gerhard's actions, they presented no summary judgment evidence that would support these conclusory statements. Appellants failed to present any summary judgment that Gerhard was a vice principal of Helena, that Helena acted with malice or gross negligence in the hiring of an unfit agent, or that Helena authorized or ratified any malice or gross negligence that may have been committed by Gerhard, Lauderdale, or the pilots. Therefore, we hold that the trial court properly granted Helena's motion for summary judgment on the issue of punitive damages.

Helena also moved for partial summary judgment on Appellants' claims for mental anguish. Helena asserted in its motions for partial summary judgment as to mental anguish that Appellants had no evidence of malevolence, ill will, or animus directed at Appellants as required to recover for mental anguish associated with Appellants' claims for gross negligence. Helena also asserted in its motions for partial summary judgment that Appellants "cannot establish" that any trespass onto their property was "deliberate and willful" as required to recover for mental anguish associated with Appellants' claims for trespass.

In Texas, there are only a few situations in which a claimant who was not physically injured may recover for his mental anguish. *Motor Express, Inc. v. Rodriguez*, 925 S.W.2d 638, 639 (Tex. 1996). Mental anguish damages cannot be awarded in a negligence case brought for damage to property unless the negligence was gross in nature and involved some ill will, animus, or intention to harm the claimant personally. *City of Tyler v. Likes*, 962 S.W.2d 489, 496 (Tex. 1997); *MBR & Assocs., Inc. v. Lile*, No. 02-11-00431-CV, 2012 WL 4661665, at *8 (Tex. App.—Fort Worth Oct. 4, 2012, pet. denied) (mem. op.); *Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 561–62 (Tex. App.—Austin 2004, no pet.); *Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730, 753–57 (Tex.

17

App.—Houston [14th Dist.] 1998, no pet.) (applying principle in gross negligence case); *accord Strickland v. Medlen*, 397 S.W.3d 184, 190 (Tex. 2013) (stating that *Likes* bars personal-injury-type damages such as mental anguish in a case alleging negligent property damage). The rationale for this rule is consistent with the general principle that emotional distress is not usually recoverable as an element of property damages unless an improper motive is involved. *MBR & Assocs.*, 2012 WL 4661665, at *8; *Seminole Pipeline*, 979 S.W.2d at 757.

Although Appellants presented some summary judgment evidence that may have shown that Helena (via Gerhard and perhaps via Lauderdale and the pilots) was grossly negligent in the aerial application of Sendero and that Appellants experienced mental anguish as a result of the damage to their cotton crops, Appellants presented no summary judgment evidence to suggest that Helena's, Gerhard's, Lauderdale's, or the pilots' actions were motivated by animus, hostility, malevolence, or ill will. "Without this additional element, the presence of gross negligence alone is not sufficient to support an award for mental anguish arising solely from damage to property." *Seminole Pipeline*, 979 S.W.2d at 757; *see also Woodlands Land Dev. Co. v. Jenkins*, 48 S.W.3d 415, 429–30 (Tex. App.—Beaumont 2001, no pet.). Because Appellants failed to present any summary judgment evidence of animus, hostility, malevolence, or ill will, the trial court did not err when it granted Helena's motions for partial summary judgment as to mental anguish associated with Appellants' claims for negligence and gross negligence.

Similarly, mental anguish damages cannot be awarded for a trespass unless the trespass was "deliberate and willful," thereby limiting the potential for excessive liability. *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 922 (Tex. 2013); *see also Lakeside Village Homeowners Ass'n v. Belanger*, 545 S.W.3d 15, 37 (Tex. App.—El Paso 2017, pet. denied). An unauthorized entry onto the land of another is a trespass, and it is a willful trespass if it was intended and deliberately

done. *Ripy v. Less*, 118 S.W. 1084, 1085 (Tex. Civ. App.—Texarkana 1909, no writ).

Although Appellants presented some summary judgment evidence that Helena, via Gerhard and the pilots, were aware of the dangers of Sendero drift and of the potential for Sendero to drift in adverse conditions, Appellants failed to present any evidence that Helena, Gerhard, Lauderdale, or the pilots willfully and deliberately caused Sendero to drift onto Appellants' properties. Therefore, the trial court did not err when it granted Helena's motions for partial summary judgment as to mental anguish associated with Appellants' claims for trespass.

We overrule Appellants' first issue.

We reverse the judgment of the trial court insofar as it rendered a take-nothing judgment against Appellants; however, we affirm the judgment of the trial court with respect to Appellants' claims for mental anguish and punitive damages. We remand the cause to the trial court for further proceedings not inconsistent with this court's opinion.

JIM R. WRIGHT
SENIOR CHIEF JUSTICE

October 16, 2020

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[3]

Willson, J., not participating.

---

[3]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.